Joseph D. DUBASKAS, Petitioner

v.

COMMONWEALTH of Pennsylvania, DEPARTMENT OF CORRECTIONS, Pennsylvania Correctional Industries, Bureau of Human Resources, Respondents.

Commonwealth Court of Pennsylvania.

Argued Sept. 11, 2013.

Decided Dec. 9, 2013.

Austin P. White, Williamsport, for petitioner.

Theron R. Perez, Chief Counsel, Mechanicsburg, for respondents.

BEFORE: PELLEGRINI, President Judge, and McGINLEY, Judge, and LEADBETTER, Judge, and SIMPSON, Judge, and BROBSON, Judge, and McCULLOUGH, Judge, and COVEY, Judge.

OPINION BY Judge BROBSON.

Petitioner Joseph D. Dubaskas (Dubaskas) petitions for review of an order of the Board of Claims (Board), dated March 15, 2013. The Board sustained the preliminary objection filed by the Department of Corrections (Department), Pennsylvania Correctional Industries (PCI), and the Department's Bureau of Human Resources (Bureau) (collectively Respondents) on the ground that the Board lacked jurisdiction over both counts of Dubaskas's Statement of Claim (Claim). In so doing, the Board dismissed the Claim, in which Dubaskas requested damages for lost or denied seniority, pay raises, and other employee benefits. For the reasons set forth below, we affirm the Board's order.

Dubaskas is employed by PCI, a bureau of the Department, as a Correctional Industries Manager 1 (CIM 1) at the State Correctional Institution–Rockview (SCI–Rockview). (Claim at ¶¶ 3–4.) On June 10, 2010, the Department offered Dubaskas employment as a CIM 1 at pay scale group CM06, Level 4, with an annual salary of $52,303. (*Id.* at ¶ 8.) Dubaskas's placement at pay scale group CM06, Level 4, reflected his prior experience of 24 years at the Federal Bureau of Prisons and comparable compensation to what he was paid by Lowes, his former employer,

in 2009.[1] (*Id.* at ¶ 9.) Dubaskas specifically negotiated this placement on the pay scale, which was critical to his acceptance of employment with the Department. (*Id.* at ¶¶ 9–10.) Dubaskas accepted employment with the Department based upon the negotiated terms, including salary, seniority, and credit for his experience, and he began his employment with PCI on June 28, 2010. (*Id.* at ¶¶ 3–4, 13.)

Due to a statewide pay freeze of all CIM 1 employees beginning in 2010 and ending July 1, 2012, Dubaskas did not receive any pay raises or increased seniority, nor did he move up from CM06, Level 4, on the pay scale. (*Id.* at ¶ 15.) On June 25, 2012, the Secretary of Corrections issued a memorandum to all staff explaining a revised pay scale, memorialized by Executive Board Resolution CN–12–010 (Resolution). (*Id.* at ¶ 16 and Exhibit B.) The Resolution became effective July 1, 2012, and changed the former 20–step pay scale to a 28–step pay scale. (*Id.* at 17.) After Respondents implemented the revised pay scale, Dubaskas was informed that he would be placed in pay scale group CM06, Step 2, which has a pay of $47,902 per year, but that he would continue to receive his compensation of $52,303 per year while being placed in the lower pay group. (*Id.* at 18–19.) The revised pay scale provided other similarly situated Correctional Industries Managers with as much as a $9,000 annual pay increase, including credit for seniority and raises over the preceding two years or more, and the ability to continue accruing seniority and receive future pay increases. (*Id.* at ¶ 20.) Dubaskas alleges that when Respondents applied the revised pay scale to him, "they stripped him of his seniority, a constitutionally protected property right, denied him the two years of seniority he accrued since beginning his employment in June 2010, and ... den[ied] him seniority to accrue over the next three years, in breach of his contract of employment." (*Id.* at 21.) Dubaskas attempted to seek redress through contacting various staff members of the Department, the Civil Service Commission, and the Department of General Services, to no avail.[2] (*Id.* at ¶¶ 22–25, 27 and Exhibits C, E.)

On December 20, 2012, Dubaskas filed the Claim against Respondents. In Count I, Dubaskas alleges that Respondents hired Dubaskas under the contractual term that he would be credited for four years of seniority, CM06, Step 4, as evidenced by what Dubaskas characterizes as an offer of employment letter, which he accepted. (*Id.* at ¶ 29 and Exhibit A.) Dubaskas further alleges that the terms of his employment included an additional year of seniority for each year he worked, including pay raises and other benefits commensurate thereto, and that he accepted employment based upon the seniority and advancement terms he was offered, giving up other employment opportunities based upon the terms as represented by Respondents. (*Id.* at ¶¶ 30–31.) Dubaskas claims that he has accrued more than two additional years of seniority since he

---

1. Dubaskas avers that prior to his employment with the Department, he retired as the Associate Warden of Industries at the Federal Correctional Complex, Allenwood, in 2006. (Claim at ¶ 5.) In 2007, PCI hired Dubaskas as Operations Manager, but he soon left that position to pursue other employment opportunities. (*Id.* at ¶ 6.) In 2009, Lowes employed Dubaskas, where he made more than $53,000 in the 2009 calendar year. (*Id.* at ¶ 7.)

2. Dubaskas avers that on November 30, 2012, he sent a written Notice of Claim to the Department, PCI, the Bureau, and the Attorney General pursuant to 42 Pa.C.S. § 5522 (providing, among other things, notice requirements for actions against government units) and 62 Pa.C.S. § 1712.1 (establishing procedure to be used in pursuing claim arising from contract entered into by Commonwealth). (Claim at ¶ 26 and Exhibit D.)

was hired and that he is entitled to a year of seniority for each year he continues employment with PCI, including a corresponding increase in pay and other benefits. (*Id.* at ¶¶ 32–33.) Dubaskas avers that Respondents' taking of Dubaskas's seniority, denial of additional accrued seniority rights since June 28, 2010, and prospective denial of the next three years of seniority to accrue constitute a breach of the contractual terms of his employment for which he has suffered damages, including lost/denied seniority, pay raises, and other benefits commensurate thereto. (*Id.* at ¶¶ 34–37.)

In Count II, Dubaskas avers that Respondents' conduct violates Section 99.52 of the Civil Service Commission's regulations, 4 Pa.Code § 99.52,[3] which relates to instituting a pay schedule change and, according to Dubaskas, is intended to protect the welfare of citizen employees like himself from losing valuable property rights by way of administration policy changes. (*Id.* at ¶¶ 39–40, 42.) Specifically, Dubaskas alleges that when Respondents instituted the revised pay schedule, they were prohibited from applying it to affect the status and seniority of Dubaskas, and that, despite this prohibition, Respondents deprived Dubaskas of his retrospective and prospective seniority, pay, and other benefits based on the revised pay schedule, in violation of Section 99.52 and in breach of his employment contract. (*Id.* at ¶¶ 41, 43–44.) Dubaskas alleges that Respondents should be ordered to compensate

Dubaskas for the seniority, pay, and other benefits commensurate with his seniority to which he is entitled under Section 99.52 and through continued employment. (*Id.* at ¶¶ 45–46.)

On January 22, 2013, Respondents filed preliminary objections to the Claim and a supporting brief. Respondents' preliminary objections were as follows: (1) the Board did not have jurisdiction over the Claim, (2) the Claim failed to conform to law or rule of Court and rules of the Board, (3) the Claim was insufficiently specific, (4) the Claim failed to state a viable claim, and (5) the Claim failed to join necessary parties. On February 22, 2013, Dubaskas filed an answer to the preliminary objections and a brief in opposition to the preliminary objections.

On March 15, 2013, the Board issued its opinion and order sustaining Respondents' jurisdictional preliminary objection, thereby dismissing the Claim. As to Count I, the Board noted that although its jurisdiction did extend to actions beyond the strict parameters of the Commonwealth Procurement Code (Code), 62 Pa.C.S. §§ 101–2311,[4] it concluded that it did not have jurisdiction over Count I because the Board has traditionally eschewed claims based on employment and/or collective bargaining agreements. (Board's Opinion at 5.) Moreover, the Board stated that Section 1724(a)(1) of the Code, 62 Pa.C.S. § 1724(a)(1), still requires that the contracts over which the Board asserts jurisdiction must be entered into in accordance

---

3. Section 99.52 of the regulations provides as follows:

 Revision of the established schedule of compensation for a class, with no significant change in classification standards as determined by the Director, will have no effect upon the status and seniority of employees. Changes in compensation may not be construed as promotions or demotions.

4. Notably, in 2002 the Legislature enacted amendments to the Code that repealed the Board of Claims Act, Act of May 20, 1937, P.L. 728, *as amended, formerly* 72 P.S. §§ 4651–1 to 4651–10, repealed by the Act of December 3, 2002, P.L. 1147, which, *inter alia,* previously set forth the jurisdiction of the Board. The Board's general grant of jurisdiction is now located in Section 1724 of the Code, 62 Pa.C.S. § 1724.

with the Code, and although the Board believed it to be appropriate to read that section pursuant to its broadest plain language meaning so as to allow jurisdiction over contracts outside of the strict parameters of the Code, it did not believe that it could address contracts explicitly excluded from the Code's coverage. (Board's Opinion at 5.) The Board concluded that because Section 103 of the Code, 62 Pa.C.S. § 103, expressly excluded "employment agreements" and "collective bargaining agreements" from coverage under the Code, and no historical imperative suggested otherwise, the Board lacked jurisdiction over the alleged contract claim described in Count I of the Claim. (Board's Opinion at 5.)

The Board also concluded that it lacked jurisdiction over Count II of the Claim because Dubaskas failed to allege facts which state any cause of action for breach of contract. (*Id.* at 6.) The Board concluded that Dubaskas was actually alleging a breach of a duty owed to him by Respondents under a statute or regulation and requesting damages flowing therefrom, and that the Pennsylvania Supreme Court has ruled that the Board does not have jurisdiction over statutory claims. (*Id.*) The Board stated that it believed this principle applied equally to claims where the obligation derives from a rule or regulation. (*Id.*) The Board further explained

that because Dubaskas's second cause of action did not sound in contract, but rather was an assertion of his statutory and/or regulatory rights, the Board lacked jurisdiction. (*Id.* at 6–7.)

The Board further concluded that because the Board lacked jurisdiction over both causes of action in the Claim, it was unnecessary to address Respondents' remaining preliminary objections. (*Id.* at 7.) Dubaskas now petitions this Court for review.

On appeal,[5] Dubaskas argues that the Board erred in concluding that it lacked jurisdiction over Count I of the Claim.[6] Specifically, Dubaskas argues that the Board erred in adopting a constricted view of its jurisdiction as provided in Section 1724 of the Code based on the definitions provided in Section 103 of the Code. Dubaskas contends that the Board has exclusive jurisdiction over *any* contract claim asserted against a Commonwealth agency, including claims arising from equitable contracts and claims involving whether a contract existed in the first place, regardless of whether the contract at issue is an "employment agreement." In support of his argument, Dubaskas relies upon our decisions in *Department of Health v. Data–Quest, Inc.*, 972 A.2d 74 (Pa.Cmwlth. 2009) (en banc), and *Hanover Insurance Co. v. State Workers' Insurance Fund*, 35

---

5. This Court's review of an order of the Board sustaining preliminary objections and dismissing a complaint is limited to determining whether the Board abused its discretion or committed an error of law. In reviewing preliminary objections, all well pleaded relevant and material facts are to be considered as true, and preliminary objections shall only be sustained when they are free and clear from doubt. Such review raises a question of law as to which our standard of review is *de novo* and our scope of review is plenary.
*Buchart Horn, Inc. v. Dep't of Transp.*, 1 A.3d 960, 964 n. 6 (Pa.Cmwlth.2010) (citations

omitted), *appeal denied*, 610 Pa. 601, 20 A.3d 489 (2011).

6. In his petition for review, Dubaskas also argues that the Board erred in several respects by not exercising jurisdiction over Count II of the Claim, relating to Section 99.52 of the regulations. Dubaskas, however, does not brief this issue, and, thus, this issue is waived. *See Van Duser v. Unemployment Comp. Bd. of Review*, 164 Pa.Cmwlth. 96, 642 A.2d 544, 548 n. 3 (1994) ("Issues not briefed are waived.").

A.3d 849 (Pa.Cmwlth.2012) (en banc), which Dubaskas claims stand for the proposition that the Board's jurisdiction is not constrained by operation of the Code and its definitions. Dubaskas also relies upon *Brown v. Taylor,* 90 Pa.Cmwlth. 23, 494 A.2d 29 (1985) (en banc), wherein a former county employee brought a cause of action in assumpsit against a court of common pleas judge alleging a breach of her employment contract, and this Court remanded the cause of action to the trial court with instructions to transfer the matter to the Board. *Brown,* 494 A.2d at 30–33. Dubaskas argues that, likewise, he claims here that an employment contract exists between the Department and himself which the Department breached, and that the Board is thus the proper forum in which to adjudicate the Claim.

The issue before us is one of statutory construction, and, therefore, we are guided by the Statutory Construction Act of 1972(Act), 1 Pa.C.S. §§ 1501–1991. The Act provides that "[t]he object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a). "The clearest indication of legislative intent is generally the plain language of a statute." *Walker v. Eleby,* 577 Pa. 104, 123, 842 A.2d 389, 400 (2004). "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). Only "[w]hen the words of the statute are not explicit" may this Court resort to statutory construction. 1 Pa.C.S. § 1921(c). "A statute is ambiguous or unclear if its language is subject to two or more reasonable interpretations." *Bethenergy Mines Inc. v. Dep't of Envtl. Prot.,* 676 A.2d 711, 715 (Pa.Cmwlth.), *appeal denied,* 546 Pa. 668, 685 A.2d 547 (1996). Moreover, "[e]very statute shall be construed, if possible, to give effect to all its provisions." 1

Pa.C.S. § 1921(a). It is presumed "[t]hat the General Assembly intends the entire statute to be effective and certain." 1 Pa.C.S. § 1922(2). Thus, no provision of a statute shall be "reduced to mere surplusage." *Walker,* 577 Pa. at 123, 842 A.2d at 400. It is also presumed "[t]hat the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable." 1 Pa.C.S. § 1922(1).

The Act further provides that "[w]ords and phrases shall be construed according to the rules of grammar and according to their common and approved usage," and that "technical words and phrases and such others as have acquired a peculiar and appropriate meaning ... shall be construed according to such peculiar and appropriate meaning or definition." 1 Pa. C.S. § 1903(a). Moreover, "if the General Assembly defines words that are used in a statute, those definitions are binding." *Pa. Associated Builders & Contractors, Inc. v. Dep't of Gen. Servs.,* 593 Pa. 580, 591, 932 A.2d 1271, 1278 (2007).

We begin with a discussion of the relevant statutory language. Section 1724(a)(1) of the Code provides, in part, that the Board "shall have exclusive jurisdiction to arbitrate claims arising from ... [a] contract entered into by a Commonwealth agency in accordance with this part and filed with the [B]oard in accordance with [S]ection 1712.1 (relating to contract controversies)." Section 103 of the Code defines the term "contract" as "[a] type of written agreement, regardless of what it may be called, for the procurement or disposal of ... services ... and executed by all parties." Section 103 of the Code defines "services" as follows:

The furnishing of labor, time or effort by a contractor not involving the delivery of a specific end product other than drawings, specifications or reports which

are merely incidental to the required performance. The term shall include the routine operation or maintenance of existing structures, buildings or real property. *The term does not include employment agreements or collective bargaining agreements.* The term includes utility services and those services formerly provided by public utilities such as electrical, telephone, water and sewage service.

*Id.* (emphasis added). Importantly, Section 103 also provides the following introductory clause:

Subject to additional definitions contained in subsequent provisions of this part which are applicable to specific provisions of this part, the following words and phrases when used in this part shall have the meanings given to them in this section unless the context clearly indicates otherwise.

*Id.*

As noted above, the parties disagree as to whether the Code and its definitions limit the Board's jurisdiction so as to exclude claims arising out of employment contracts entered into with the Commonwealth. Several cases are instructive on this issue. We first turn to *Pennsylvania Associated Builders*, a case not cited by either party in their briefs. In *Pennsylvania Associated Builders*, the Pennsylvania Supreme Court addressed the issue of whether Section 513 of the Code, 62 Pa. C.S. § 513, applied to construction contracts. *Pa. Associated Builders*, 593 Pa. at 590, 932 A.2d at 1278–79. That section provides, in part, that "[w]hen ... the use of competitive sealed bidding is either not practicable or advantageous to the Commonwealth, a contract may be entered into by competitive sealed proposals." 62 Pa. C.S. § 513(a). In holding that Section 513 did apply to such contracts, the Supreme Court concluded that the Code's definition

of "contract" as set forth in Section 103 of the Code applied to Section 513 of the Code. *Pa. Associated Builders*, 593 Pa. at 593, 932 A.2d at 1279. In so doing, the Supreme Court rejected this Court's reasoning that Section 513 did not apply to construction contracts, in part, because (1) the definition of "contract" provided in Section 103 of the Code " 'is not preclusive because within the ... Code that definition is not always used to include construction contracts,' " and (2) "a ruling that Section 513 included construction contracts would ignore portions of the Code's legislative history" indicating that construction contracts were to be excluded from certain sections of the Code. *Id.* at 589–90, 932 A.2d at 1277 (quoting *Pa. Associated Builders & Contractors, Inc. v. Dep't of Gen. Servs.*, 899 A.2d 389, 396 (Pa.Cmwlth. 2006) (en banc), *rev'd*, 593 Pa. 580, 932 A.2d 1271 (2007)). The Supreme Court reasoned that Section 103's introductory clause evidenced

that the General Assembly contemplated that there might be instances in the Code when a term defined in [Section 103], like "contract," has a meaning that differs from the definition given it, and directed that attention be paid to what surrounds the term in order to determine whether or not the Code's definition applies.

*Id.* at 592–93, 932 A.2d at 1279. Nevertheless, the Supreme Court concluded that:

[W]hen read in context, there is nothing to indicate that the General Assembly intended for the word "contract" as used in [the exception provided in Section 513 of the Code] to mean something other than its Code definition—"[a] ... written agreement ... for the procurement or disposal of supplies, services or construction." Moreover, in our view, this definition of contract is clear and explicit in including contracts for construction.

Therefore, we conclude that the clear and unambiguous language of the exception in Section 513 encompasses construction contracts.

*Id.* at 593, 932 A.2d at 1279 (citations omitted) (quoting 62 Pa.C.S. § 103).

Notably, the Supreme Court also concluded that it was inappropriate for this Court to rely upon legislative history to construe Section 513 of the Code in deciding that it did not apply to construction contracts. The Supreme Court explained:

> Under the ... Act, it is only when the words of a statute are not explicit that factors extraneous to statutory language may be consulted to ascertain the General Assembly's intent. Because the words of Section 513 are clear with respect to the question before us, the Code's contemporaneous legislative history, one of the extraneous factors listed in the Act, should not have been consulted.

*Id.* at 593, 932 A.2d at 1279–80 (citations omitted).

Two years after the Supreme Court's decision in *Pennsylvania Associated Builders,* this Court decided *Data–Quest,* wherein we held that the Code's definition of "contract" in Section 103 did not operate to exclude from the Board's jurisdiction claims arising out of quasi-contracts. In concluding that the Board retained jurisdiction over such claims, we rejected the argument that Section 1724(a)(1) of the Code grants jurisdiction to the Board only over claims arising from a "contract" as defined by Section 103 of the Code, which provides, in part, that a contract is "[a] type of *written* agreement," and no written executed agreement existed between the parties. *Data–Quest, Inc.,* 972 A.2d at 77 (emphasis added). In support of our conclusion, we referenced our Supreme Court's decision in *Pennsylvania Associated Builders,* observing that "the phrase

'unless the context clearly indicates otherwise' [in Section 103's introductory clause] signals the [L]egislature's contemplation that a term defined in Section 103 may have a meaning that is different from the definition given it, thereby directing the courts to pay attention to what surrounds the term in order to determine whether the ... Code's definition applied." *Data–Quest,* 972 A.2d at 80 (quoting 62 Pa.C.S. § 103) (discussing *Pa. Associated Builders,* 593 Pa. at 592–93, 932 A.2d at 1279).

Upon consideration of the remedial provisions of Chapter 17 of the Code as a whole and examining the statutory language surrounding the term "contract" in Chapter 17, we rejected the premise that Section 103's definition of "contract" applies to Chapter 17's provisions, noting that the definition is incompatible with the remedial provisions of Sections 1711.1(a) and 1711.2(1) of the Code, 62 Pa.C.S. §§ 1711.1(a), 1711.2(1). In other words, we held that the context indicated that the definition of "contract" in Section 103 did not apply to certain provisions of the Code.

In doing so, we found "it compelling that defining a contract as a written executed agreement would extinguish claims regarding the formation or existence of a contract," a result that was already rejected by our Supreme Court in *Shovel Transfer & Storage, Inc. v. Simpson,* 523 Pa. 235, 565 A.2d 1153 (1989), and that applying the definition of the term "contract" as provided in Section 103 of the Code "would deprive the Board of its ability to determine whether a valid contract existed, either express or implied." *Data–Quest,* 972 A.2d at 80–81. Furthermore, we emphasized "that the Board and its predecessors have exercised jurisdiction over quasi-contract claims since 1811," and that "[t]he Board was established in furtherance of a public policy extending more than 200 years ago to allow claimants who

ordinarily would have been barred by sovereign immunity to have a method of redress against the Commonwealth." *Id.* at 78–79. Moreover, this Court also noted that "statutory provisions that decrease the jurisdiction of a court of record must be strictly construed" and that our Supreme Court has observed that " 'if the scope of equity's common law jurisdiction was to have been diminished [by a statute], the language therein should have been ... explicit.' " *Id.* at 79 (alteration in original) (quoting *Armstrong Sch. Dist. v. Armstrong Educ. Ass'n*, 528 Pa. 170, 178, 595 A.2d 1139, 1144 (1991)). Further, we stated that the Legislature must explicitly express its intention " 'to depart from salutary public policy principles,' " with any power so granted being strictly construed as well. *Id.* (quoting *Consumers Educ. & Protective Ass'n v. Schwartz*, 495 Pa. 10, 19, 432 A.2d 173, 178 (1981)). Thus, "after considering the relevant statutory language in the ... Code, case law authority interpreting the 200–year history of the Board's jurisdiction over quasi-contract claims, relevant principles of statutory construction and the absence of any ... legislative intent in the 2002 [amendments] to extinguish Board jurisdiction over quasi-contract claims," we "conclude[d] that the provision 'claims arising from ... [a] contract' in Section 1724(a)(1) of the ... Code must be construed to include claims arising from contracts implied-in-law, or quasi-contract claims." *Id.* at 80–81.

In 2012, this Court was presented with another opportunity to interpret Section 1724 of the Code. In *Hanover*, we addressed the issue of whether claims against the State Workers' Insurance Fund (SWIF) are within the exclusive jurisdiction of the Board, where those claims allegedly arose under an insurance policy issued by SWIF. *Hanover*, 35 A.3d at 850–51. Relying in large part on our decision in *Data–Quest*, we concluded that such claims are within the exclusive jurisdiction of the Board. *Id.* at 856. In so doing, we noted "that Pennsylvania courts have broadly construed the statute conferring jurisdiction of the Board," citing *Data–Quest* as well as *Brown*, among other cases, in support of this proposition. *Id.* at 852–55 & n. 6. We also observed that "interpreting the ... Code as severely restricting the Board's jurisdiction to matters involving the Commonwealth's purchase of goods or services arguably deprives all parties who enter into other types of agreements with the Commonwealth, including those who purchase goods or services *from* the Commonwealth, of a remedy in the event of a breach," and we noted that our Supreme Court in *Shovel Transfer* emphasized the importance of having an available forum for parties to seek redress against the Commonwealth. *Id.* at 855–56 (emphasis in original). Thus, we concluded that "in light of well-settled precedent and the lack of clear legislative intent, ... the provisions of the ... Code have not altered or limited the exclusive jurisdiction of the Board over th[e] matter." *Id.* at 856.

Importantly, we reached our conclusion in *Hanover* despite the argument that the Board lacked jurisdiction over the claims at issue because the Board only had jurisdiction over claims filed by a "contractor" as defined in Section 103 of the Code, and the petitioners did not meet that definition.[7] *Id.* at 852. We also reached our

---

7. Specifically, the petitioners argued that Section 1724 of the Code granted the Board exclusive jurisdiction over claims filed in accordance with Section 1712.1 of the Code, which provides that "[a] contractor may file a claim," and, thus, the Board's jurisdiction is limited to claims filed by a "contractor." *Hanover*, 35 A.3d at 852. The petitioners further contended that because Section 103 of the Code defines a "contractor" as a "person

conclusion notwithstanding the argument that all Pennsylvania cases that had analyzed the issue involved procurement contracts, and that the cases SWIF relied upon in arguing that the Board did have jurisdiction over the matter were decided under the predecessor statute, which "allowed for a considerably broader scope of jurisdiction than the current statute does." *Id.*

Finally, our Supreme Court's recent decision in *Scientific Games International, Inc. v. Department of Revenue*, —— Pa. ——, 66 A.3d 740 (2013), another case that is not cited by the parties, also provides helpful guidance as to our disposition of this matter. In that case, the Supreme Court addressed the issue of whether the Board's exclusive jurisdiction over procurement litigation against Commonwealth agencies forecloses original jurisdiction actions in this Court, seeking declaratory and injunctive relief. *Scientific Games*, —— Pa. at ——, 66 A.3d at 743. In concluding that such actions are foreclosed, the Supreme Court first discussed the doctrine of sovereign immunity. *Id.* at ——, 66 A.3d at 753–58. Citing Section 1702 of the Code, the Supreme Court noted that the Code "is designedly structured to accord immunity, subject only to specific and limited exceptions." *Id.* at ——, 66 A.3d at 753 (citing 62 Pa.C.S. § 1702). The Supreme Court further explained that "the exception to sovereign immunity pertaining to Board–of–Claims jurisdiction defines the extent of the Commonwealth's statutory exception from sovereign immunity for claims arising from contract." *Id.* at ——, 66 A.3d at 755. The Supreme Court also observed:

> The constitutionally-grounded, statutory doctrine of sovereign immunity ob-

viously serves to protect government policymaking prerogatives and the public fisc. To a degree, it has been tempered to recognize the rights and interests of those who may have been harmed by government actors, and/or, in the contract arena, to remove a substantial disincentive for private individuals to pursue government contracts. Understandably, some immunity applications may be distasteful to those who may discern government wrongdoing, or at least unremediated collateral injury to private concerns resulting from governmental policy changes. In light of the constitutional basis for the General Assembly's allocation of immunity, however, the area implicates the separation of powers among the branches of government also crafted by the framers. Thus, in absence of constitutional infirmity, courts are not free to circumvent the Legislature's statutory immunity directives pertaining to the sovereign.

> . . . .

> While more general clarification of the relationship between sovereign immunity and jurisdiction may be appropriate in the arena at large, for present purposes, we regard sovereign immunity as a jurisdictional concern vis-á-vis the . . . Code. Our understanding, in this regard, is premised on the enactment's self-contained reaffirmation of sovereign immunity, and its explicit, limited waiver of such immunity (among other specified and limited waivers) in connection with a coordinate allocation of "exclusive jurisdiction" to the Board . . . over claims arising from certain contracts entered into by a Commonwealth agency. In this respect, we agree . . . that—as a matter of jurisdiction—if the General

that has entered into a contract with a Commonwealth agency" and no contract existed between the petitioners and the Common-

wealth respondents, their claims fell outside of the Board's jurisdiction. *Id.*

Assembly has not specifically provided by statute for such nonmonetary relief in a claim arising from a contract entered into by a Commonwealth agency under the ... Code, then either the claim is within the exclusive jurisdiction of the Board ... or it is barred by sovereign immunity.... [T]his is consistent with the longstanding public policy ... of broadly channeling contract claims through the Board[,] ... which also remains the initial arbiter of whether a contract exists.

*Id.* at ——, 66 A.3d at 755–56 (citations omitted) (footnotes omitted). The Supreme Court concluded that "[r]elative to controversies in matters arising from procurement contracts with Commonwealth agencies, the Board ... retains exclusive jurisdiction (subject to all jurisdictional prerequisites), which is not to be supplanted by a court of law through an exercise of original jurisdiction."[8] *Id.* at ——, 66 A.3d at 760.

In light of the statutory language in the Code and the precedent discussed above, we hold that the Board does not have jurisdiction over claims arising from employment contracts entered into with the Commonwealth. Our reading of *Scientific Games* reveals that the Supreme Court placed great emphasis on the Code's reaffirmation of sovereign immunity, which the Code waives *only in specific and limited circumstances.* One such circumstance is when a claim is brought in accordance with Subchapter C of the Code, relating to the Board. *See* 62 Pa.C.S. § 1702(b). Although applicable precedent indicates a long-standing public policy of broadly interpreting the jurisdiction of the Board, even with regard to claims that are "beyond strict application of the ... Code," (Board's Opinion at 3), as evidenced by *Data–Quest* and *Hanover,* we conclude that this broad interpretation does not "stand for wholesale abandonment of the statutory limitations of the Board's jurisdictional power," (Respondents' Brief at 9), particularly with regard to claims against the Commonwealth arising out of employment contracts.[9] Rather, as noted by the Supreme Court in *Scientific Games,* the Board has jurisdiction over "claims arising from *certain* contracts entered into by a Commonwealth agency," and there are still "jurisdictional prerequisites" that must be met in order for the Board to exercise its jurisdiction over a particular claim. *See Scientific Games,* —— Pa. at ——, 66 A.3d at 756, 760 (emphasis added). To ascertain those jurisdictional prerequisites, we look to the statutory provisions of the Code.

---

8. Notably, in *Scientific Games,* the Supreme Court declined the Board's "request to broadly settle the jurisdictional landscape," stating:
 At most, we will say that the Commonwealth Court's *en banc* decision in *Hanover* remains the prevailing law of Pennsylvania unless and until the position is reviewed by this Court. Additionally, the Board ... and other litigants and *amici* are certainly free to rely on aspects of our reasoning here which are supportive of their positions in future presentations in matters implicating jurisdictional aspects more salient to the Board['s] ... concerns.
 *Scientific Games,* —— Pa. at —— n. 16, 66 A.3d at 753 n. 16.

9. Although cases exist to support the argument that the Board has jurisdiction over claims arising out of employment contracts in particular, it appears that these cases either were decided prior to the 2002 amendments, *see, e.g., Brown,* 494 A.2d at 30–33, or discuss the issue in dicta only. *See, e.g., Cutler v. State Civil Serv. Comm'n,* 924 A.2d 706, 717 n. 19 (Pa.Cmwlth.) (declining to address whether valid contract was created when petitioner was offered position by Office of Administration which petitioner accepted, and noting that "[i]f there was a contract, it is the Board ... that has exclusive jurisdiction"), *appeal denied,* 596 Pa. 710, 940 A.2d 366 (2007).

Section 1724(a)(1) of the Code provides, in part, that the Board has jurisdiction over claims arising from "[a] contract entered into by a Commonwealth agency." The Code defines "contract," in part, as an agreement for the procurement of "services," a term which *does not include employment agreements or collective bargaining agreements.*" 62 Pa.C.S. § 103 (emphasis added). Using a similar line of reasoning to the Supreme Court in *Pennsylvania Associated Builders,* we observe here that when read in context, there is nothing to indicate that the General Assembly intended for the word "services" as used in the definition of "contract" to mean something other than its Code definition, nor is there anything contextual to indicate that the General Assembly intended for the word "contract" as used in Section 1724(a)(1) to mean something other than its Code definition, subject to the modifications imposed by *Data–Quest* and *Hanover.*[10] Because the Code *explicitly and unambiguously excludes* "employment agreements" from what constitute "services" under the Code, it follows that "employment agreements" are not "services" that can be the subject of a "contract" that falls within of the scope of the Board's jurisdiction as outlined in Section 1724(a)(1). Because the words of the statutory provisions at issue in this case are clear and unambiguous "with respect to the question before us," our inquiry ends here. *See Pa. Associated Builders,* 593 Pa. at 593, 932 A.2d at 1279–80. Thus, we conclude that with respect to Section 1724(a)(1) of the Code, the Code's definitions of "contract" and "services" in Section 103 of the Code function as components of the "jurisdictional prerequisites" that bar from the exclusive jurisdiction of the Board claims arising from employment contracts entered into by the Commonwealth. The Board, therefore, did not err when it concluded that it lacked jurisdiction over the Claim and dismissed the Claim on that basis.

Accordingly, we affirm the order of the Board.

### *ORDER*

AND NOW, this 9th day of December, 2013, the order of the Board of Claims is hereby AFFIRMED.

CONCURRING OPINION BY Judge McCULLOUGH.

I concur in the Majority's conclusion that, because section 103 of the Procurement Code *explicitly and unambiguously excludes "employment agreements"* from

---

**10.** Notably, *Data–Quest* and *Hanover* are distinguishable from the matter presently before the Court in that neither case involved a type of contract that was *explicitly excluded by* statutory language in the Code. Additionally, in light of the legal principles discussed in *Data–Quest,* indicating that the Legislature is to be explicit in enacting statutory provisions that decrease a tribunal's jurisdiction or depart from salutary public policy principles and that courts must strictly construe such statutory provisions, we conclude that the Legislature's explicit omission of "employment agreements" from the definition of the term "services" constitutes such explicit action that withstands scrutiny even under a strict interpretation of the statutory language.

Moreover, we recognize that as a result of broad language used in *Data–Quest* and *Hanover,* those decisions could be interpreted to indicate that certain Code definitions generally do not apply to limit the Board's exclusive jurisdiction over contract claims against the Commonwealth. We reach our conclusion above notwithstanding such language, and further conclude that in light of the Supreme Court's decision in *Scientific Games* and our decision herein, the holdings in *Data–Quest* and *Hanover* are limited to the types of contracts that were at issue in those cases (*i.e.,* quasi-contracts and SWIF contracts).

the definition of "services," employment agreements are not services that can be the subject of a contract that falls within the scope of the Board of Claims' jurisdiction. However, I write separately because I believe that, in responding to the appellant's two-and-a-half pages of argument,[1] the Majority unnecessarily undertakes an extensive analysis of prior decisions, including dicta with which, in relevant part, I do not agree.

In his brief, appellant Joseph D. Dubaskas summarily argues that our decisions in *Hanover Insurance Company v. State Workers' Insurance Fund*, 35 A.3d 849 (Pa.Cmwlth.2012), *Department of Health v. Data–Quest, Inc.*, 972 A.2d 74 (Pa. Cmwlth.2009), and *Brown v. Taylor*, 90 Pa.Cmwlth. 23, 494 A.2d 29 (1985), hold that the Board of Claims has jurisdiction over *all* breach of contract claims against the Commonwealth, including his breach of employment contract claims. As the Majority recognizes, albeit in footnotes, these cases are distinguishable, and I submit that the distinctions provide a sufficient basis to reject Dubaskas's contention.

*Brown* involved a complaint brought by a discharged employee against a court of common pleas judge setting forth three causes of action: a violation of her constitutional rights, an action in assumpsit, and an action in trespass. On appeal was the trial court's order sustaining preliminary objections to the employee's complaint. With respect to the cause of action in assumpsit, we held that section 761(a)(1)(iii) of the Judicial Code, 42 Pa. C.S. § 761(a)(1)(iii), which excepts from our jurisdiction actions that should be commenced before the Board of Claims under the Act of May 20, 1937, P.L. 728, *as amended*, 72 P.S. §§ 4651–1–4651–10,

would vest jurisdiction over that claim in the Board of Claims rather than in this Court. As the Majority correctly notes, this case was decided prior to the 2002 amendments; thus, it cannot be controlling authority in the present case.

In *Data Quest*, we addressed whether the Board of Claims has jurisdiction over a quasi-contract claim against the Commonwealth that was not based on a written agreement under section 1724 of the Procurement Code. Data–Quest spent four years developing and tailoring a software program which the Department of Health (Department) repeatedly assured Data–Quest it was going to purchase. However, no written contract was executed. After it became evident that the Department was not going to purchase the system, Data–Quest sent a series of letters to the Department demanding payment for its services. The Department declined to make payment, and Data–Quest filed a claim with the Board of Claims, asserting theories of promissory estoppel and quasi-contract. The Department filed preliminary objections asserting that the 2002 Act limited the Board's jurisdiction to claims arising out of a written agreement with the Commonwealth. The Board overruled the Department's preliminary objections, and this Court granted the Department permission to file an interlocutory appeal.

We rejected the Department's argument that the Board's jurisdiction over quasi-contract claims was extinguished by the 2002 Act. We began our analysis in *Data Quest* by emphasizing that the Board and its predecessors have exercised exclusive jurisdiction over quasi-contract claims since 1811. We also noted that statutory provisions which decrease the jurisdiction

---

**1.** As the Board observed, "the [appellant] attempts, in a very inexact and sketchy manner, to present his pay grade/seniority dispute with the Department as a contract action." (Board's op. at 5.)

of a court of record must be strictly construed. 1 Pa.C.S. § 1928(b)(7). Next, we cited the well-settled principle that where the Pennsylvania legislature seeks to depart from salutary public policy principles it must express its intention to do so explicitly, and we observed that such intention had not been explicitly expressed in the 2002 amendments. Finally, we noted the Supreme Court's emphasis, in *Shovel Transfer & Storage, Inc. v. Simpson*, 523 Pa. 235, 565 A.2d 1153 (1989), on the importance of an available forum.[2]

In *Hanover Insurance Co. v. State Workers' Insurance Fund*, 35 A.3d 849 (Pa.Cmwlth.2012), this court held that the provisions of the Procurement Code did not narrow the scope of the Board of Claims' jurisdiction so as to exclude jurisdiction over a breach of contract claim against SWIF. Relying on *Data Quest*, we emphasized that statutory provisions that decrease the jurisdiction of a court of record must be strictly construed, and that the where the Pennsylvania legislature seeks to depart from salutary public policy principles it must express its intention to do so explicitly. We also cited the Supreme Court's emphasis on the importance of an available forum in *Shovel Transfer*.

Neither *Data Quest* nor *Hanover* involved an employment contract, a type of contract that is, in fact, expressly excluded by the 2002 language applicable here. (See Majority op. at 20 n. 10) Thus, Dubaskas's reliance on these decisions—the only authority he cites—is plainly misplaced.

The issue in *Scientific Games International, Inc. v. Department of Revenue*, —— Pa. ——, 66 A.3d 740 (2013), was whether the Board's exclusive jurisdiction over procurement litigation against Common-

wealth parties foreclosed an original jurisdiction proceeding in Commonwealth Court challenging a Commonwealth agency's cancellation of a request for proposals and seeking declaratory and injunctive relief. Reversing this court's decision, the Supreme Court held that it was error to interpret section 1724 of the Code so broadly as to sanction original jurisdiction actions in a judicial tribunal over nonmonetary claims against the Commonwealth. "To the contrary, nonmonetary claims are cognizable only to the extent they fall within some specified waiver or exception to immunity." *Id.* at ——, 66 A.3d at 757.

In *Scientific Games*, our Supreme Court declined to address the Board's request to "broadly settle the jurisdictional landscape," *Id.* at ——, 66 A.3d at 753, n. 16, emphasizing that the matter before it did not involve a procurement dispute. I believe that our decision in the present matter should likewise be appropriately limited to the discrete issue raised on appeal.

The narrow question raised in this appeal is whether our decisions in *Hanover, Data Quest* and *Brown* compel the conclusion that employment contracts fall within the exclusive jurisdiction of the Board of Claims. As the Majority observes, in footnotes 9 and 10, each of these cases is significantly distinguishable: *Brown* was decided prior to the 2002 amendments, and neither *Hanover* nor *Data Quest* involved the type of contract at issue here, i.e., one that was specifically excluded by statutory language in the Code. I believe that these distinctions are a sufficient basis upon which to reject the appellant's contentions, and I would affirm the Board's holding without attempting to "broadly settle the

2. "This Court finds it compelling that defining a contract as a written executed agreement would extinguish claims regarding the forma-
tion or existence of a contract, which result was rejected in *Shovel Transfer* ...." *Data-Quest*, 972 A.2d at 80.

jurisdictional landscape" until such time as the matter is properly before the Court. The holdings in *Data Quest* and *Hanover* were not broadly stated; because they did not implicate the Board's authority over issues beyond those presented to the Court, I would refrain from addressing their application to future matters.